**FILED**
2020 Dec-11 PM 03:59
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

| | |
|---|---|
| **ROCCO J. LEO as TRUSTEE** )<br>**of BANKRUPCY ESTATE OF** )<br>**CHRISTY GRIGSBY and** )<br>**ANTHONY GRIGSBY, and** )<br>**GRIGSBY FARM** )<br> )<br>    **Plaintiffs,** )<br> )<br> )<br> )<br> )<br>**KOCH FOODS, LLC; KOCH** )<br>**FARMS OF GADSDEN, LLC;** )<br>**KOCH FARMS, LLC;** )<br>**JCG FARMS OF GEORGIA, LLC;** )<br>**JCG FARMS OF ALABAMA,** )<br>**LLC; and KOCH FOODS, LLC,** )<br> )<br>    **Defendant.** ) | **CIVIL ACTION NO.:**<br>**CV-20-** |

## PLAINTIFF'S COMPLAINT AND JURY DEMAND

COME NOW the Plaintiffs, Rocco J. Leo as Trustee of Bankruptcy Estate of

Christy Grigsby and Anthony Grigsby and Grigsby Farm, (collectively, "Plaintiffs")

by and through their attorneys, and for their complaint against the above-named

Defendant, states as follows:

## NATURE OF THE CASE

1.     Plaintiffs bring this action based on violations of the Packers and

1

Stockyards Act of 1921, Breach of Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing, Fraud, Fraudulent Concealment, Misrepresentation, Negligence, and Punitive Damages.

## PARTIES

2.      Plaintiffs Anthony Grigsby and Christy Grigsby (hereinafter "the Grigsbys") are individuals residing in Orange Beach, Baldwin County, Alabama, and are the sole owners of Grigsby Farm.

3.      Plaintiff Rocco J. Leo is the Trustee of the bankruptcy estate of Plaintiffs Anthony and Christy Grigsby and as such is the real party in interest for this matter.

4.      Plaintiff Grigsby Farm is a sole proprietor with its principal place of business in Boaz, Etowah County, Alabama, and it entered into a poultry growing arrangement with Defendants, Koch Foods, LLC and Defendant Koch Farms of Gadsden, LLC, to grow broiler chickens (hereinafter "broilers") in Alabama. At all relevant times, Grigsby Farm owned and operated a total of four growing houses on its farm.

5.      Defendant Koch Foods, LLC (hereinafter "Koch LLC") is a registered business in the State of Alabama, with its principal place of business in Henegar, Alabama, and it participated in the acts and plans complained of herein.

2

6.     Defendant Koch Farms of Gadsden, LLC, (hereinafter "Koch Farms") is a registered business in the State of Alabama, with its principal place of business in Montgomery, Alabama, and it participated in the acts and plans complained of herein.

7.     Defendant Koch Farms, LLC is a registered business in the State of Alabama, with its principal place of business in Henegar, Alabama, and it participated in the acts and plans complained of herein.  Defendants Koch Farms of Gadsden, LLC, and Defendant Koch Farms, LLC are collectively referred to herein as "Koch Farms".

8.     Defendant JCG Farms of Georgia, LLC (hereinafter "JCG Farms-GA") is an entity, with its principal place of in Park Ridge, Illinois, registered to do business in the State of Alabama, and it participated in the acts and plans complained of herein.

9.     Defendant JCG Farms of Alabama, LLC (hereinafter "JCG Farms-AL") is an entity, with its principal place of in Park Ridge, Illinois, registered to do business in the State of Alabama, and it participated in the acts and plans complained of herein.  Defendant JCG Farms-GA and Defendant JCG-AL are collectively referred to herein as "Defendants JCG".

10.     Defendant Koch Foods, Inc. (hereinafter "Koch Foods") is registered as a Delaware corporation headquartered in Park Ridge, Illinois.  It is authorized to

3

do business in the State of Alabama, and it participated in the acts and plans complained of herein.

11.    Defendant Koch Foods, LLC, Defendant Koch Farms of Gadsden, LLC, Defendant Koch Farms, LLC, and Defendant Koch Foods, Inc. are collectively referred to herein as "Defendants Koch".

## JURISDICTION AND VENUE

12.    This Court has original jurisdiction under 28 U.S.C. §1331 as this action involves violations of the federal Packers and Stockyards Act of 1921.

13.    This Court has supplemental jurisdiction over pendent claims arising under Alabama law pursuant to 28 U.S.C §1367.

14.    Venue is proper because the Plaintiffs and Defendant's relevant facility reside in this district.

## FACTS

15.    This is a case whereby Defendants, and their named employees, acted illegally and unconscionably in a manner that prevented the Plaintiffs from growing chickens in a fair and profitable manner.

16.    Koch Foods is one of the largest poultry dealers in the United States, slaughtering and shipping for consumption millions of pounds of chicken each week.

17.    Koch Foods and all Defendants operate as what is known as an

4

"integrator." They control every aspect of raising chickens, slaughtering them, and selling their meat. Koch Food's various chicken meat products come from broiler chickens that are hatched in Defendants' hatcheries, from eggs laid by Defendants' hens, and remain Defendants' property throughout their entire lives. The broilers are grown on feed formulated and provided by Defendants Koch and Defendant JCG, in conditions regulated by Defendants, and treated by veterinarians hired by Defendants according to Defendants' standards and rules. They are slaughtered on the date Defendants select, in Koch Foods' plants, where Defendants' employees evaluate the birds to determine whether they are fit for human consumption. If fit for consumption, they are sold based on Defendants' preexisting contracts. If not, Defendants still sells the chicken to usually produce feed for other animals such as dogs and cats.

18.    In this system, traditional farmers/independent contractors such as, the Plaintiffs, are known as "growers." They bare all the risk. They are responsible for building and maintaining the farms on which the broilers are cared for, relying on Defendants' representations regarding its commitment to its contractors and their future earnings to take out substantial loans for which they are personally responsible.

19.    Plaintiffs are paid based on a "tournament system," in which all growers whose chickens are slaughtered within a given week compete with one another. The top producing growers—as solely determined by Defendants Koch and

Defendants JCG—are paid a premium and the lower ranked growers are subjected to offsetting discounts or deductions. This ensures that Defendants' costs are consistent, but the growers can neither predict nor control their pay.

20.    Defendants Koch and Defendants JCG leverage this system and its position as the sole integrator with whom these Plaintiffs can do business to manipulate the market, defraud Plaintiffs, and dodge its contractual obligations.

21.    Defendants Koch and Defendants JCG induced Plaintiffs to join its operation through material representations regarding their compensation and Koch's institutional commitment to ensure that growers receive a reasonable return on their investment. But, in fact, as Defendants knew or should have known, they had no policy or procedures in place to protect growers. Instead, Defendants operate their business to consistently advantage itself, to the disadvantage of the growers, regularly breaching its commitments to growers regarding the type and volume of product they will be asked to produce—undermining growers' ability to turn a profit—and manipulating its operations so that growers can neither predict nor rely upon a specific level of income.

22.    Despite Plaintiffs regularly notifying Defendants' managers that the company was not fulfilling its promises, Defendants made no effort to carry out its commitments.

23.    Defendants Koch and Defendants JCG unilaterally decreased the

number and quality of flocks Plaintiffs were allowed to care for and selected certain growers to receive flocks comprised of less healthy chickens.

24.     Defendants Koch and Defendants JCG failed to provide the flocks Plaintiffs were given to care for with proper feed and veterinary care, sometimes nonetheless charging Plaintiffs for services that were not provided.

25.     Defendants Koch and Defendants JCG also forced Plaintiffs to bring to slaughter underweight and unfit birds, but then held Plaintiffs accountable for failing to deliver more meat for human consumption, thereby reducing their compensation. Defendants Koch and Defendants JCG determine the dates on which Plaintiffs would be allowed to bring the birds to slaughter, which also undermined Plaintiffs ability to increase their compensation.

26.     Defendants Koch and Defendants JCG condemned birds that were fit for human consumption and sold birds as part of its dog and cat food for which Plaintiffs were never compensated.

27.     Defendants Koch and Defendants JCG scheduled slaughters so that the tournament system pitted growers with older houses against those with newer equipment, knowingly advantaging the growers with newer houses, even though the other growers were producing efficiently and, had they been placed in a different tournament, they would have received greater compensation.

28.     Defendants Koch and Defendants JCG wrongfully sought to compel

7

Plaintiffs to assume yet more debt by updating their facilities irrespective of the fact that Plaintiffs were efficiently producing for Defendants.

29.    Defendants Koch and Defendants JCG violated the Packers and Stockyards Act, breached the terms of its agreements and its obligations of good faith and fair dealing, and committed common law fraud.

30.    Defendants Koch and Defendants JCG made specific promises to Plaintiffs to induce them into entering into contractual obligations with Koch, on which the Plaintiffs specifically relied, which turned out to be false and which Defendants knew or should have known were false at the time the promises were made. These promises include but are not limited to the following:

a.    Defendants Koch induced Plaintiffs to invest in chicken houses that measure 40' x 500', which is larger than the typical houses built by growers—promising that these houses were profitable and that Koch would deliver 30,800 chickens per flock, which only occurred in the beginning and later began bringing less chickens. Plaintiffs relied upon these representations when obtaining financing via their banks and/or lending institutions to build these chicken houses, and as a result these chicken houses never reached acceptable cash flow to justify the financial obligations incurred by the growers to buy them in the first place. In reality, upon information and belief, these chicken houses are not as efficient and profitable as promised and the growers are not treated fairly from Koch. Koch should have been well aware of this fact, as it tracks many variables for its grower's houses in minute detail.

b.    Defendants Koch represented to Plaintiffs that when developing the rankings of the growers for the tournament system, condemnation would not be counted against them in formulating the rankings. The Plaintiffs relied upon these representations as being true. In reality, condemnation was indeed charged against the Plaintiffs, to their financial detriment.

c.    Defendants Koch and Defendants JCG falsified tickets outlining

8

how much feed the Plaintiffs were actually given. Koch's settlement sheets also charged Plaintiffs for feed that was never actually delivered. This resulted in Plaintiffs' financial detriment.

    d.    Defendants Koch and Defendants JCG improperly and unnecessarily delayed weighing birds which resulted in reduced compensation.

    e.    Defendants Koch and Defendants JCG falsified the numbers of birds that died at the houses of the growers in an attempt to improve the Gadsden Complex's statistics. This caused financial detriment to the Plaintiffs. On information and belief, this conduct was undertaken to increase the pay of Koch's Gadsden Complex employees. Koch's complexes compete with one another on various statistics, including the number of birds culled from houses. On information and belief, employees of high ranking complexes receive bonuses.

    f.    Defendants Koch and Defendants JCG represented to the Plaintiffs that they would get feed that was not refurbished, that was delivered on time, and of which had sufficient fat content in it so that the chickens would eat the feed, improve their weight, and make the growers poultry growing arrangement with Koch a profitable one. In reality, the feed delivered by Defendants Koch and Defendants JCG to the growers was incessantly late; was not delivered on a consistent basis; many times it was refurbished feed which is less desirable to the chickens; it was the wrong feed for the age of the bird; and the fat content was excessive which makes the feed less desirable to the birds. None of this was told to the Plaintiffs before entering into poultry growing arrangement with Koch. Koch knew or should have been aware of these facts as it was their policy and practice to provide refurbished food, wrong feed for age of bird, it tracked in detail the time of deliveries and was aware that it had no system to ensure on time deliveries.

    g.    After entering into the aforesaid poultry growing arrangement with Defendants Koch, Koch later indicated that Plaintiffs would have to expend exorbitant amounts of money to "retrofit" the chicken houses to comply with chicken house specifications and purchase extra things they would require. Defendants Koch indicated these mandatory upgrades and changes in chicken house specifications leading to grower additional capital investments would be necessary before Koch would continue to do business with the growers. Defendants Koch threatened to withhold chicks if Plaintiffs

did not agree to make these additional expenditures. This is despite the fact that Plaintiffs had relied upon the representations of Defendants Koch that before entering into the poultry growing arrangements with Koch that any and all subsequent changes in chicken houses specifications would be reasonable. In reality not only were these requested changes in specifications unreasonable, they were unreasonably expensive for the growers and in violation of United States Department of Agriculture standards thereby causing financial harm to them.

h.     Defendants Koch and Defendants JCG did not apply the requirements for chicken house specifications equitably or fairly. Plaintiffs were told before they entered into agreements with Koch that any and all chicken house specifications would be applied across the board, and that all growers would have the same monetary obligations to assure that the specifications were achieved to Koch's satisfaction. Plaintiffs relied on this representation because it helped ensure that they would not be encumbered with unnecessary debt. In reality, Defendants Koch and Defendants JCG unfairly, unreasonably and arbitrarily chose and continues to choose which growers will incur the financial burden to meet these arbitrary specifications, to the financial detriment of the Plaintiffs herein. Defendants Koch and Defendants JCG knew that its representation was false as it was Koch's policy and practice to provide its complexes discretion regarding which growers they would require to make modifications and Koch's Gadsden, Alabama plant regularly exercised this discretion inconsistently.

i.     Defendants Koch and Defendants JCG represented to the Plaintiffs that the chickens delivered pursuant to their agreements would be healthy and able to be reasonably grown to sufficient weight so as to make the venture profitable for the growers. Plaintiffs relied upon this representation before entering into the poultry growing arrangements with Koch. In reality, the chicks delivered to the Plaintiffs had a whole host of maladies and disease which impacts the rankings of the Plaintiffs in the tournament system, and in turn harms them financially. Defendants Koch and Defendants JCG knew or should have known that its representation was false as it tracks the health of the chicks and the production of growers' facilities in detail and thus was aware that it was providing certain growers unhealthy chicks which was harming their production. At time, Plaintiffs were even giving antibiotics prior to the delivery of chickens and were told to be prepared to dose the chickens accordingly.

31.     Plaintiffs purchased Grigsby Farms in approximately December 2007, and they moved into the farm in January 2008.

32.     Plaintiffs began entering into contracts with Defendants in January 2008, and they continued entering into contracts with Defendants until Defendants refused to provide them with additional flocks in or about January 2019, without ever providing any notification, written or oral, on the same.

33.     Plaintiffs only agreed to join Defendants Koch's and Defendants JCG's scheme—in which growers bare all of the risk and their compensation can be manipulated by factors entirely out of their control and independent of the market—based on Koch's representations that it would apply its system fairly and in a manner to ensure Plaintiffs a reasonable return on their investments of money, labor, and risk.

34.     Defendants Koch and Defendants JCG made material representations to Plaintiffs either knowing they were false or recklessly and/or without taking appropriate steps to ensure that the company would carry through on its commitments.  Koch instituted no controls to ensure that Defendants operated in the interests of growers and, instead, institutionalized a system in which the company acted only in its immediate financial interests and without regard for the consequences to growers. Koch made the false representations to induce Plaintiffs to enter into poultry growing arrangements with Defendants and Plaintiffs did rely on those representations. And, because Defendants failed to abide by its representations, Plaintiffs were injured.

## Koch's Relationship With Its Growers

35.     As with all the local growers, Plaintiffs individually entered into unconscionable adhesion growout contracts with Defendants Koch titled Broiler Production Contract (hereinafter "Agreement"). Pursuant to the Agreement, Defendants Koch and Defendants JCG supply the chicks, feed, medicine, and other necessary supplies to the grower (Plaintiffs). The growers care for the chicks for approximately 30 to 40 days. Growers own their farms, chicken houses and equipment, and provide labor, materials, and utilities necessary to care for the chicks. The chicken houses and equipment must originally meet Koch's strict requirements dealing with design plans and specifications subject to Koch's sole approval before a grower is accepted by Koch. Defendants also dictate the type of veterinary care provided to the birds throughout their lives and the birds' conditions of confinement.

36.     Plaintiffs' farm originally went through strict upgrades to bring them to Koch Class "A" status. A USDA Guaranteed Loan of the Farm Service Agency was given to make these upgrades before the first chicken was placed on the farm.

37.     Under the Agreement, Defendants Koch and Defendants JCG, through complex management, are required to timely deliver as well as accurately track the delivery of grower inputs (chicks, feed, and medication) and timely remove the grown birds for processing. Defendants, through management of the complex, also is required to provide technical assistance via field technicians who regularly visit growers' farms.

38.     Upon entering into the Agreement, Defendants take almost unrestricted power, including but not limited to, monopsony over Plaintiffs, and Plaintiffs become entangled in Koch's compensation scheme. Indeed, in order to enter into the Agreement, Plaintiffs were required to financially encumber their real and personal property and to convert their real property to a sole use thereby functionally depreciating said property and devaluing said property and rendering Plaintiffs as tenants totally at the mercy of Defendants.

39.     Defendants Koch and Defendants JCG pay growers based on a "tournament system." In the tournament system growers, including but not limited to Plaintiffs, initially are ranked and correspondingly compensated based on an "Average Net Pound Value" at the Gadsden Complex. That is, Plaintiffs are not paid based on their individual performance. Instead, Defendants use a formula to determine the performance of all growers who brought birds to slaughter that week and depending on how they perform in light of that formula in comparison to the other growers, Defendants make adjustment to their pay. Depending on performance on variables that factor into that formula such as "farm weight," "farm-caused condemnation," "livability," "total value," "chick value," "feed value," "feed conversion," and "net pounds," a grower will be paid vastly more or vastly less than the base pay denominator (Average Net Pound Value), per pound of broilers produced and vastly different amounts than the other growers who brought birds to slaughter that week. Also, another factor that is completely out of the grower's control is Defendants' on sales contracts that they file based on orders, so a grower may be picked up early or late based on sales orders which can

make it impossible to evenly compete against another grower on a particular sale week.

40.     By ranking individual growers, including Plaintiffs, Defendants place each grower into a competitive posture against all other growers and arbitrarily penalize each less successful grower based upon criteria, some of which is never revealed, explained or discussed with Plaintiffs, which are under the total control of Defendants. While placing Plaintiffs in competition with each other, Defendants require Plaintiffs to accept chicks which are genetically different than other growers, as these chicks have varying degrees of heredities, and congenital traits such as weight gain capability, susceptibility to disease and or health issues. Furthermore, their feed is dis-similar in quantity, quality, and consistency and is often delivered inappropriately and in an untimely manner. The timing of feed delivery directly impacts feed conversion rates.

41.     Plaintiffs are further ranked against other growers although they possess dissimilar facilities, equipment, and technology. Additionally, Plaintiffs received varying degrees of technical assistance and were required to comply with management practices which are inconsistent with their fellow growers.

42.     Defendants Koch and Defendants JCG receive the same sale price for its comparable products sold no matter the type of chicken house it was grown in, therefore the end result of said system is the imposition of an arbitrary and capricious ranking of each grower and Plaintiffs which is designed to insure the company's ability to wrongfully control its cost of operations and maintain undue financial dominance over Plaintiffs.

14

43.     The Agreement also places performance requirements on the grower, which include Plaintiffs. For example, a grower who settles two consecutive flocks with an "Individual Net Pound Value" of forty-hundredths of one cent or higher than the weekly variable-based-adjusted Average Net Pound Value referenced above, colloquially known as being "in the High 40," will be advised in writing that the next consecutive flock of broilers for 180 days, settling in the High 40 will place that grower on "Intensified Management Status." This is also referred to as the "PiP" Program. They also call it a minus 40 or better to the grower.

44.     If a grower, including Plaintiffs, is placed on Intensified Management Status, the Agreement provides that: (a) a meeting will be scheduled with that grower and the complex's Live Production staff to discuss specific recommendations that growers can adopt that may improve his/her performance; (b) if the complex's Live Production staff recommends in writing and that grower agrees to upgrade or invest in new equipment, he/she will be removed from Intensified Management Status immediately upon installation; (c) that grower will be removed from Intensified Management Status when two of three consecutive flocks do not settle in the High 40; (d) if, at any time while on Intensified Management Status, a grower settles in the High 40 his/her next chick placement density will be reduced by fifteen percent (15%) (with this reduction being removed if the next flock does not settle in the High 40); and (e) a grower will be subject to termination if two of three consecutive flocks of broilers settle in the High 40 while that grower is on Intensified Management Status **AND** that grower

ranks in the bottom ten percent (10%) of all growers for the complex. Notwithstanding, based on the Agreement, "All settlements, records, and communications will be reviewed by the Complex Manager before the Agreement is terminated pursuant to the Performance Improvement Program." Despite these terms being in the Agreement, the aforementioned Intensified Management Status is applied inconsistently among growers, including Plaintiffs.

45.     The key variables that determine growers' scores, ranking, and ultimately their compensation under the tournament are entirely under Defendants Koch's and Defendants JCG's control and therefore subject to manipulation without detection by the growers, enabling Defendants to artificially depress a particular grower's compensation.

46.     Defendants' Complex Managers, Live Production Managers, Broiler Managers and Service Technicians collectively dictate when chicks will be delivered to the growers' farms, including those of the Plaintiffs, how many chicks will be delivered, the quality and type of chicks that will be delivered, and when the grown birds will be removed from the growers' farms for processing.

47.     The quality of the chicks provided by Defendants is influenced by a number of factors, including the age of the laying hen, breed type, sex of the chick, and the amount of time spent at the hatchery after hatching but prior to being placed on a farm. Poor chick quality causes increased mortality/decreased livability, decreased feed conversion, and increased farm-caused condemnation. Thus, chick quality significantly affects grower compensation. Defendants track these factors in detail. The determination of which growers receive better or worse

16

quality chicks, are totally within complex management's and Defendants' sole control, and with respect to Plaintiffs, as set out in detail below, have been subject to fraudulent actions.

48.     Defendants' Complex Managers, Live Production Managers, Broiler Managers, and Service Technicians also collectively dictate the manner in which feed, the single most critical factor (other than water, which Defendants Koch do not provide) in growing healthy birds is delivered to the growers' farms. This includes whether growers, including Plaintiffs receive "reclaimed feed," *i.e.*, unused, likely stale feed, collected from other growers' farms. Reclaimed feed is of a substantially decreased quality as compared to freshly milled feed, and poor feed quality results in stunted growth, malnutrition, inability to fight diseases, and high mortality, all of which significantly decrease farm profitability. These feed-delivery decisions are totally within complex management's and Defendants' sole control, and with respect to Plaintiffs, as set out in detail below, have been subject to fraudulent, deceptive, unjustly discriminatory, and negligent manipulation. Reclaimed feed is not being equitably divided among the growers. Furthermore, Defendants do not acknowledge or disclose they are providing growers with reclaimed feed.

49.     Within Defendants' and the Complex Management's sole control is the provision or withholding of necessary medications for the chicks, as well as the date on which Defendants remove the grown birds from the growers' farms for processing. These decisions affect mortality, livability, feed conversion, and farm-caused condemnation, and consequently, directly and proximately grower payout.

And as set out in detail below, have been subject to fraud, deception, and negligence.

### Examples of Koch's Inducements to Growers

50.     In order to convince growers, including Plaintiffs, to join this system, Defendants Koch made material, false representations to induce growers such as Plaintiffs to enter into a poultry growing arrangement with Koch, particularly assurances that Koch would not solely act to benefit its bottom line, but would take into account *all* growers needs and even absorb certain costs to ensure that growers could profit.

51.     For example, prior to entering into a poultry growing arrangement with Defendants, Plaintiffs had a conversation with the then Koch's Housing coordinator employee which sought to assure Plaintiffs that Koch "take[s] care of [its] people" and thus, there was no need to worry about the ways in which Koch's system could be used to disadvantage growers.

52.     Part of Defendants Koch's corporate strategy in recruiting growers is to convince the growers that Koch's business interests and plans align with those of the grower, so that the grower can trust and rely upon Defendants Koch. These are representations Defendants intended growers to rely upon and Plaintiffs did rely on these representations.

53.     Defendants Koch not only sought to induce Plaintiffs to enter into a poultry growing arrangement based on representations regarding its corporate culture, but also by making specific representations regarding the amount of

chickens Plaintiffs could expect to be provided and the anticipated compensation for those chickens.

## Examples Of Koch's Falsehoods

54.     Defendants Koch and Defendants JCG knew or recklessly disregarded the fact that the representations they made were false. Defendants' actual corporate strategy, policy and practices, instituted from Koch's managers down, was not to act in the interests of growers, but to advance the company's bottom line regardless of its impact on growers, including Plaintiffs.

55.     Defendants unilaterally decreased or would excessively increase the amount of time Plaintiffs were allowed to care for the birds received, reducing Plaintiffs' ability to achieve higher weights or better feed conversations, and thereby undermining Plaintiffs' return. For several flocks, Defendants instructed Plaintiffs to reduce the target weight of his birds from the weight they had been contracted to achieve, thereby decreasing Plaintiffs' potential compensation for those flocks.

56.     Defendants also extended the amount of time between placing flocks with growers by four to six days, reducing the total number of chickens Plaintiffs and other growers could care for and thus their potential compensation.

57.     Defendants regularly provided Plaintiffs with chickens that it knows to be unhealthy or of lesser quality. Determining which growers receive better or worse quality chickens is totally within complex management's and Defendants' sole control. Defendants regularly provided Plaintiffs chickens that it knew would be of lesser quality than the chicken provided to other growers

against whom Plaintiffs would compete in the tournament. Plaintiffs have also received flocks that Defendants knew were so sickly it has preemptively prescribed antibiotics, despite Koch's new policy to raise antibiotic free meat. Accordingly, Defendants have knowingly set up certain of Plaintiffs' houses to receive deductions under the tournament system.

58.     Defendants Koch and Defendants JCG also fail to properly administer its feed production and delivery operation so as to provide Plaintiffs proper feed in a reasonable and responsible manner. Defendants allowed Plaintiffs to run out of the feed. Plaintiffs were charged for feed that was not delivered to their farm. Plaintiffs measured the feed that they received and discovered that Defendants were charging them for feed that had never been delivered. Plaintiffs complained, but they did not notice any improvement in Defendants' practices. Plaintiffs later uncovered that they were charged for the wrong amount of feed, which Plaintiff Anthony Grigsby reported to Koch's dispatcher

59.     On information and belief, when birds were shipped to the human consumption processing plant, Defendants Koch have allowed those birds to sit in the trucks without food or water, for unreasonable amounts of time thereby reducing their weight and growers' ultimate compensation.

60.     Defendants Koch unreasonably condemn birds that arrive at the processing plant. The growers, including Plaintiffs, are not compensated for the weight of the condemned birds, and the number of condemned birds negatively affects their ranking in the tournament system, reducing their compensation for the remaining birds.

61.     Defendants Koch sells the condemned birds for profit, without compensating Plaintiffs.  Condemned birds are used for dog food or other animal food, for which Defendants reaps profits.   Defendants' growers, including Plaintiffs, are never compensated for Defendants using the meat from the chickens that the growers cared for.

### Koch's Manipulation Of Mortality Sheets

62.     Beyond the false representations listed above, Defendants also mislead and manipulated Plaintiffs through their use of mortality sheets.

63.     When chicks are initially delivered to a farm, a Koch employee places in each chicken house what is known as a "mortality sheet" which lists the number of chicks placed in that chicken house, and provides blank spaces for growers to tally the number of chicks that die or are culled each day from that growing-house (for whatever reason) that might render them unacceptable to Koch, and also lists the hen flock from which the chicks were born.

64.     Each day the chickens are on the grower's farm, Plaintiffs were required to tally the number of them that are found dead in each growing-house, as well as the number that are culled, and pencil in those figures on the mortality sheet for that growing-house.

65.     Simply put, the initial number of chicks placed on each farm less the dead/culled chicks, as well as the amount of feed used on the growers' farm during the flock growth, are utilized to calculate payout variables relevant to the tournament system, such as livability and feed conversion after the grown birds are removed from growers' farms for processing.

66.     The calculations under each tournament are computed or "settled" by Defendants and are included on a settlement statement that is mailed to all the growers, including Plaintiffs, for the complex and contains a ranking of each competing grower based on the variables, *inter alia*, listed above.

67.     Upon information and belief, after settlements are finalized there are growers that receive "hidden payments," which are unequally distributed.

68.     Upon information and belief, Defendants' management ordered that, for certain growers, hatchery supervisors replace dead chickens at no cost to those growers and allow those growers to stop recording the number of dead chickens they removed from their facilities. The intent and direct effect of such scheme was to cover up Koch's true mortality rates.  The Koch management misrepresented the accurate mortality rates thereby artificially inflating its operational efficiency as it competed with other complexes throughout the country.

69.     This practice adversely affected Plaintiffs' compensation. For the growers who received the benefit of this scheme, it gave the fraudulent appearance that a lower number of chicks were dying or had become unprocessable thereby leading to higher compensation. The altered mortality rates factor into, *inter alia,* livability and feed conversion variables. For those Plaintiffs who competed against the benefited growers in the tournament, it comparatively lowered compensation for Plaintiffs.

## Koch's Condemnation Scheme

70.       Defendants further devised and set into motion a scheme whereby it would reduce the compensation of Plaintiffs by using a "condemnation scheme", thereby increasing Koch's profits at the expense of and to the severe detriment of Plaintiffs. Specifically, Plaintiffs are charged for the birds condemned at the processing plant, even though the birds belong to Koch, by taking the number of condemned birds and multiplying that by the average weight of the non-condemned birds and then subtracting that amount from the growers pay weight, thereby directly reducing the growers' compensation. Defendants did this regardless of the fact that birds are largely condemned because they are sickly and therefore typically weigh much less that the average non-condemned bird slaughtered for consumption.

71.       Plaintiffs are also charged again for the "farm condemned" birds even though the birds belong to Defendants Koch and are sent to the growers with congenital defects as well as varying poultry diseases thereby reducing the growers' compensation.

72.       Finally, Defendants send the condemned birds to a rendering plant or dog food plant and Koch receives compensation for said birds which is not shared with Plaintiffs.

73.       This scheme is based upon factors which are under the total control of Defendants and which were never properly revealed, explained or discussed with Plaintiffs. The end result of said system is the imposition of the arbitrary and capricious costs against Plaintiffs which is designed to ensure

Koch's ability to wrongfully control its cost of operations and maintain undue financial dominance over Plaintiffs.

### Koch's Breaches, Unconscionable and Fraudulent Conduct

74.    Defendants have engaged in a pattern of conduct that is unfair, unjustly discriminatory, unreasonably preferential or advantageous, unreasonably prejudicial, unreasonably disadvantageous, fraudulent, manipulative, deceptive, and negligent in order to impede and hinder Plaintiffs ability to efficiently and profitably care for broilers, and at the same time conceal their malicious and outrageous conduct by harassing and blaming Plaintiffs to maximize the appearance of the complex's performance.

75.    Defendants knowingly made materially false representations, both written and oral, about future income, costs, expenses, company policies and working relationships to Plaintiffs and/or concealed related material facts and information from Plaintiffs, including but not limited to the "tournament system" and the inequities related thereto to accomplish this inducement, knowing that Plaintiffs were ignorant as to the falsity of these representations and that they would accept them as the truth and rely thereon to their detriment and proximate injury.

76.    Defendants have utilized their power to ensure that Plaintiffs consistently received artificially low rankings and, thus, decreased compensation.

77.    During the course of their relationship, Defendants have materially misled Plaintiffs as to the financial prospects of growing poultry for Koch.   Defendants were aware that said profit projections were false and

misleading when made and have been guilty of malice and bad faith in making said material misrepresentations.

78.     During the course of their relationship, Defendants have knowingly and willfully furnished to Plaintiffs substandard food for the chicks which has resulted in a financial loss to Plaintiffs. Said actions were done knowingly and willfully and constitute bad faith on the part of said Defendant.

79.     Defendants have deliberately and in bad faith taken certain wrongful actions regarding the weighing of the chickens, delivery of feed, and requiring of "updates" and modifications, which have resulted in financial loss to Plaintiffs.

80.     As outlined herein, Defendants devised and implemented a scheme to defraud Plaintiffs in that it extended advantages to other competing growers which were not extended to Plaintiffs, and directly disadvantaged Plaintiffs, including providing replacement chicks to competing growers without reflecting these facts on the settlement statements for the respective competitive rounds and manipulating catch-out dates to the advantage of Plaintiffs' competitor at Plaintiffs' detriment.

81.     Defendants made false representations of material fact, including the compensation due Plaintiffs and the performance figures utilized in calculating same. Defendants knew that the figures were false as it was Defendants who directly falsified the figures or engaged in conduct which lead to the figures being inaccurate and then covered up said conduct.

82.     Defendants intended for Plaintiffs to believe their mortalities incurred, ratings, rankings, and compensation due were not what they actually were and that the payments they received were accurate.

83.     Defendants also threatened to force Plaintiffs from the market. Despite arrangements and agreements that obligated Defendants to continue to do business with Plaintiffs, and despite the fact that Plaintiffs were continuing to successfully produce chicken for Defendants Koch, Defendants demanded that Plaintiffs immediately make upgrades and alterations to their facilities or face being denied future agreements. Defendants began retaliating against Plaintiffs after their complaints and changed Plaintiffs to be placed in Class B from Class A pay rate. Defendants also threatened Plaintiffs with unwarranted write-ups, up to and including ones in December 2018.

84.     Defendants also directed how Plaintiffs, are to "design" and "improve" their growing facilities. Defendants set requirements that were unnecessary for efficient production and do not reflect normal market forces.

85.     Koch sought to intimidate Plaintiffs for exercising their rights under the agreement and law. For example, Koch Broiler Manager, Dion Rainwater, told several service technicians to go together to the Plaintiffs' property without their consent, take photos of their facilities, access the controller computers without permission and try to intimidate in hopes to find anything they could to harass the Plaintiffs or sabotage their facilities.

86.     Plaintiffs relied on the false representations in determining the compensation due to them from Defendants under the Agreement.

87.     As a direct, proximate and foreseeable cause of the fraudulent scheme, Plaintiffs have incurred damages in that their compensation under their Agreement has been significantly and consistently diminished.

### Koch's Conduct Is Likely To Harm Competition

88.     Defendants are a "live poultry dealer" within the meaning of the Packers and Stockyards Act, as its poultry is obtained in commerce, it ships or sells poultry in commence, or poultry products from its poultry are shipped or sold in commerce and it is "engaged in the business of obtaining live poultry by purchase or under a poultry growing arrangement for the purpose of either slaughtering it or selling it for slaughter by another." 7 U.S.C. § 182(10).

89.     Defendants occupy an anticompetitive position within the relevant market or markets for poultry grower services—the services provided by Plaintiffs. It has engaged in numerous acts that, individually and as a course or courses of conduct, have and are likely to harm competition. It lacks a legitimate business reason for these acts.

90.     The poultry market is vertically integrated, where integrators control both the products, *i.e.*, the chickens, and the means by which to bring those products to market, *i.e.*, the feed mills, veterinary care, trucking operations, slaughterhouses, processing facilities, and sales contracts. As a result, it is exceptionally expensive and logistically complex for new integrators to emerge and compete with existing integrators.

91.     Defendants Koch, including its Gadsden Complex, is a poultry integrator that purchases grower services.

92.    Plaintiffs are sellers of grower services for poultry broilers.

93.    Upon information and belief, Defendants as an integrator, collude with other poultry integrators, including through a database known as "Agra-Stats," which provides information, including grower pay, broken down by each integrator's complex.

94.    On information and belief, this collusion is undertaken with the intent to harm competition for grower services.

95.    Integrators collude with one another to establish barriers for growers to enter and exit the business. On information and belief, they work with one another to ensure that these requirements function as barriers to entry and exit, discouraging growers from moving between integrators. For instance, on information and belief, they collude to ensure that each integrator requires new growers to take out additional loans and "update" the growers' facilities before the integrator will enter into a poultry growing arrangement with that grower.

96.    In this manner, integrators establish non-market forces that will keep growers from moving between integrators even where multiple integrators occupy the same geographic market.

97.    Defendants' acts in the market or markets covered by its Gadsden Complex enable and likely cause the arbitrary manipulation of prices and payments to growers and subverts normal market forces for consumers of Koch's goods and sellers of grower services alike.

98.    Defendants have no legitimate business purpose for this conduct.

99.     Defendants' conduct violated numerous regulations promulgated by the United States Department of Agriculture under the Packers and Stockyards Act. These regulations prohibit acts that the Executive has established are likely to harm competition. Thus, Defendants' conduct was *per se* likely to harm competition.

100.     Specifically, Defendants violated 9 C.F.R §201.216, which establishes criteria for when an integrator can demand a grower make additional capital investments. Defendants Koch's arbitrary demands that Plaintiffs make additional investments and improvements to their facilities violated this provision. Thus, Defendants' conduct was *per se* likely to harm competition.

101.     Defendants also violated 9 C.F.R §201.82, which required Koch to transport chickens promptly after loading and weigh chickens immediately upon arrival at the processing plant. However, Defendants allowed Plaintiffs' flocks to sit in cages on trucks for long periods of time without feed prior to weighing, during which time the chickens would lose weight and incur additional damages. This reduced Plaintiffs' compensation under the tournament system. Thus, Defendants' conduct was *per se* likely to harm competition.

102.     In addition to its conduct against growers, Defendants Koch's tournament payment system, which it uses to pay growers of its Gadsden Complex, is also likely to harm competition and subvert normal market forces.

103.     In the tournament payment system, Defendants, not the market, set the formula that determines payment.

104.    The United States Department of Agriculture has recognized that a tournament payment system "create[s] a reasonable likelihood of competitive injury" whether or not the integrator is a monopsonist or occupies an anticompetitive position within the market. *See, e.g., Implementation of Regulations Required Under Title XI of the Food, Conservation and Energy Act of 2008; Conduct in Violation of the Act*, 75 Fed. Reg. 35338 (2010).

105.    The tournament system subjects growers to non-market forces, which discouraged them from responding to market demands through innovation, diversification and/or adjusting the size, quality, and variety of their output. This also means that growers are not competing with one another as they would in a competitive market and is likely to drive growers who would otherwise be competitive from the market.

106.    Further, beyond the typical features of the tournament system that are likely to harm competition, at its Gadsden Complex, Defendants implemented its tournament system in a manner that is likely to subvert the market and harm competition. Koch compelled growers' facilities to compete against one another even if they were provided chickens of different quality and different quality services from Defendants—*e.g.*, they were provided different levels of veterinary care or quality of feed. As a result, even assuming Koch's formula was the proper way to measure the growers' production, the tournament did not properly compensate the growers based on their efficiencies, preventing true competition among the growers and preventing them from responding to market forces.

30

## COUNT I: VIOLATIONS OF THE FEDERAL PACKERS AND STOCKYARDS ACT OF 1921, AS AMENDED

107.      Plaintiffs re-allege each and every allegation as set forth above, and hereby incorporate same by reference, as if all were set forth fully herein. Defendants, by the above acts and omissions, are in violation of the Packers and Stockyards Act of 1921, 7 U.S.C. §181 *et seq.*

108.      Defendants have engaged in or used unfair practices or devices in violations of 7 U.S.C. § 192(a).

109.      Defendants have engaged in or used unjustly discriminatory, or deceptive practices or devices in violation of 7 U.S.C. § 192(a).

110.      Defendants have made or given undue or unreasonable preferences or advantages to a person or locality or subjected a person or locality to undue or unreasonable prejudice or disadvantage in violations of 7 U.S.C. § 192(b).

111.      Defendants have violated 7 U.S.C. § 192(g) by conspiring, acting in combine, agreeing, or arranging with each other or with any other person to do, or aid or abet the doing of acts and omissions made unlawful by 7 U.S.C. § 192(a) & (b).

112.   Plaintiffs have been injured and damaged by this conduct. The unlawful conduct under the Packers and Stockyards Act caused Plaintiffs' injuries and damages.  Plaintiffs are entitled to recover for their injuries and damages. *See* 7 U.S.C. § 209(a).  Plaintiffs are also entitled to attorneys' fees and costs to pursue these claims to the full extent allowed by the law.

## COUNT II: BREACH OF CONTRACT

113.     Plaintiffs re-allege each and every allegation as set forth above, and hereby incorporate same by reference, as if all were set forth fully herein.

114.     Plaintiffs entered into Agreements with Koch under which Plaintiffs are entitled to compensation based on performance variables such as grower cost, weight, feed conversion and livability.  Plaintiffs were also entitled to certain notifications pursuant to these Agreements.

115.     In breach of the aforesaid Agreements, Defendants did not accurately calculated Plaintiffs' bird weights, feed conversions, and livability.

116.     Plaintiffs are owed the amounts they should have received had the weights, feed conversions, and livability of their chickens been accurately calculated.

117.     Defendants agreed to pay to Plaintiffs certain incentives, which incentives were never provided, despite Plaintiffs faithfully performing all the conditions, covenants and promises on their part to be performed.

118.     Defendants have failed to abide by notification requirements of said Agreements, and failed to place flocks on Plaintiffs' farm, despite Plaintiffs faithfully performing their obligations.

119.     Plaintiffs have incurred damages in that they have not been compensated the amounts actually due per the Agreements, constituting breach of contract.

## COUNT III: UNCONSCIONABILITY OF
## BROILER PRODUCTION CONTRACT

140.　　Plaintiffs re-allege each and every allegation as set forth above,
and hereby incorporate same by reference, as if all were set forth fully herein.

141.　　The Agreement as noted herein, solely drafted by Defendants
with superior bargaining strength, is unconscionable and a contract of adhesion
for the reasons noted in this Complaint, and for the additional reason that the terms
are oppressive and require Plaintiffs to perform actions that cannot, under the
tournament system arbitrarily and capriciously applied by Koch, be reasonably
satisfied.

142.　　Being that the Agreement is unconscionable, relevant provisions
of the Agreement cannot be enforced against Plaintiffs.

## COUNT IV: BREACH OF THE IMPLIED COVENANT OF
## GOOD FAITH AND FAIR DEALING

143.　　Plaintiffs re-allege each and every allegation as set forth above,
and hereby incorporate same by reference, as if all were set forth fully herein.

144.　　Alabama law implies a covenant of good faith and fair dealing in
all contracts.

145.　As a result of the actions of Defendants, it has violated the implied
covenant of good faith and fair dealing contained in the agreements as against
Plaintiffs herein, and as a result thereof, Plaintiffs are entitled to their damages
incurred.

146.    The foregoing actions were intentional, willful and wanton, and done toward Plaintiffs with sufficient fraud, malice, and oppression to warrant the imposition of punitive damages against Defendant.

## COUNT V: FRAUD

147.    Plaintiffs re-allege each and every allegation as set forth above, and hereby incorporate same by reference, as if all were set forth fully herein.

148.    Defendants' fraudulent concealment of material information and material, false representations to Plaintiffs were fraudulent and were made for the purpose of deceiving Plaintiffs.

149.    Defendants knew that the representations made were false and Defendants intended for Plaintiffs to rely on these false representations. Defendant intentionally, fraudulently or through gross negligence concealed material information for the purpose of deceiving Plaintiffs.

150.    Plaintiffs reasonably relied on these false statements or were subjected to fraudulent concealment and were direct victims of the fraud.

151.    Plaintiffs are entitled to their damages incurred.

152.    The foregoing actions were intentional, willful, and wanton, and done toward Plaintiffs with sufficient fraud, malice, and oppression to warrant the imposition of punitive damages against Defendants.

153.    Defendants intentionally, maliciously, willfully, and wantonly, intended to defraud Plaintiffs, by both material false misrepresentations and fraudulent concealment of material facts, and did in fact so defraud Plaintiffs. The fraudulent acts by Defendants and Plaintiffs' reliance upon Defendant's

fraudulent representations were both the actual and proximate cause of injury to Plaintiffs.

154.    The intentional and/or grossly negligent and fraudulent acts and omissions of Defendants and the fraud itself constitute a willful, wanton, intentional and malicious disregard for the rights of Plaintiffs, their property, both real and personal, and the rights and property, both real and personal, of the public at large who are dependent upon Defendants to maintain a basic modicum of business standards and societal morality in their dealings with poultry growers. Had Defendants conducted itself in good faith using ordinary care and even the most basic standards of care and social mores, the injuries suffered by Plaintiffs would not have occurred. The combined effect of Defendants' total disregard for the rights of Plaintiffs, its gross negligence and their outrageously fraudulent and dishonest behavior entitles Plaintiffs to recover from Defendants herein an award of compensatory, consequential and punitive damages.

## **DAMAGES**

155.    As a direct result of the wrongful actions of Defendants, Plaintiffs have suffered monetary damages. Plaintiffs have suffered property damage and property loss, both real and personal, and other economic and non-economic losses as a result of the illegal activities engaged in by Defendants. Plaintiffs also suffered physical harm and mental anguish due to the actions of Defendants. Because the wrongful actions of Defendants are the actual, proximate and direct cause of this unfortunate circumstance, Plaintiffs are entitled to recover from Defendants herein an award of damages for their losses sustained.

156.     As a result of the intentional, deliberate, and wrongful actions of Defendants, as mentioned herein, Plaintiffs were caused to suffer damages. Defendants meanwhile amassed huge sums of profits as a result of the aforesaid wrongful practices. Defendants are liable to Plaintiffs for actual damages, as well as all attorney's fees, expenses, and costs herein.

157.     The misrepresentations, omissions, and concealment of material facts and other wrongful acts by Defendants were intentional and deliberate acts, and were as part of a willful scheme or course of conduct whereby Defendants sought to and did induce Plaintiffs, on the basis of and in reliance upon fraudulent misrepresentations and concealment. Employing said scheme Koch amassed large sums of profits and gain. Said acts on the part of Defendants were done knowingly and intentionally and constitute intentional, willful, and fraudulent conduct rendering Defendants liable for punitive, as well as actual damages.

158.     Defendants' acts and omissions, policies, practices, and conduct as described in this Complaint rose to the level of wanton, indifferent and/or reckless disregard for the well-being of Plaintiffs, and such conduct constituted gross negligence and gross indifference to the welfare of Plaintiffs, entitling Plaintiffs to punitive damages.

159.     Defendants' acts and their omissions, policies, practices, and conduct as described in this Complaint were such that their conduct toward Plaintiffs was done with oppression, fraud or malice entitling Plaintiffs to a recovery from Defendant for punitive damages.

**WHEREFORE**, Plaintiffs pray as follows:

(a) That this Court assume jurisdiction over this action and provide a trial by jury;

(b) Award Plaintiffs compensatory damages against Defendants in amount the jury determines will compensate Plaintiffs for their losses and damages suffered;

(c) Award punitive damages against Defendants in an amount that the jury determines is adequate to punish Defendants for their wrongful conduct and to deter other from similar conduct in the future, and/or nominal damages as may be appropriate;

(d) Award Plaintiffs reasonable costs and attorneys' fees associated with this action;

(e) Award Plaintiffs such other equitable and legal relief to which they may be entitled to receive;

(f) For pre and post judgment interest; and

## JURY DEMAND

Plaintiffs demand trial by jury on issues herein pleaded triable to a jury.

Respectfully submitted,

Candis A. McGowan
Rocco Calamusa, Jr.
Counsel for the Plaintiff
WIGGINS CHILDS PANTAZIS
    FISHER & GOLDFARB, LLC
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
Telephone: (205) 314-0500
Facsimile: (205) 254-1500
cmcgowan@wigginschilds.com
rcalamusa@wigginschilds.com


Mary Beth Mantiply
Post Office Box 862
Montrose, Alabama 36559
Telephone: (251) 625-4040
mbmantiplylaw@gmail.com

## **DEFENDANTS' ADDRESSES**

To be Served via Certified Mail

Koch Foods, LLC
c/o Registered Agent
CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, Alabama 36104

Koch Farms of Gadsden, LLC
c/o Registered Agent
CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, Alabama 36104

Koch Farms, LLC
c/o Registered Agent
CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, Alabama 36104

JCG Farms of Georgia, LLC
c/o Registered Agent
CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, Alabama 36104

JCG Farms of Alabama, LLC
c/o Registered Agent
CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, Alabama 36104

Koch Foods, Inc.
1300 Higgins Road, Suite 100
Park Ridge, Illinois 60068