FILED

2022 Sep-13  PM 02:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **ROCCO J. LEO,** as Trustee of **Bankruptcy Estate of Christy Grigsby and Anthony Grigsby and Grigsby Farm,** | ] ] ] ] ] | |
| **Plaintiff,** | ] ] | **Case No.: 4:20-cv-01997-ACA** |
| **v.** | ] ] | |
| **KOCH FARMS OF GADSDEN, LLC, et al.,** | ] ] ] | |
| **Defendants.** | ] | |

## <u>MEMORANDUM OPINION</u>

This case comes before the court on a partial motion to dismiss. (Doc. 66). Defendants Koch Farms of Gadsden, LLC and Koch Foods, Inc. (collectively "Koch") have moved to dismiss parts of Plaintiff Rocco J. Leo's fraud claim pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.[1] (*Id.*). Koch contends that Mr. Leo alleges seven distinct acts of fraud, six of which are not pleaded with particularity and do not support a plausible claim for relief. (Doc. 67 at 6–11). For the following reasons, the court **WILL GRANT** Koch's partial motion to dismiss.

---

[1] Koch also moves to dismiss "[a]ny claims Plaintiff might have for fraudulent concealment or negligence." (Doc. 67 at 3). But, as he concedes (doc. 69 at 10), Mr. Leo does not bring fraudulent concealment or negligence claims. The court cannot dismiss claims that do not exist. The court will disregard that part of Koch's motion.

# I.    BACKGROUND

At this stage, the court must accept as true the factual allegations in the third amended complaint and construe them in the light most favorable to the plaintiff. *Butler v. Sheriff of Palm Beach Cnty.*, 685 F.3d 1261, 1265 (11th Cir. 2012).

The third amended complaint alleges a poultry dealer that fraudulently manipulates its relationships with chicken growers. Koch is one of the largest poultry dealers in the United States, "slaughtering and shipping for consumption millions of pounds of chicken each week." (Doc. 61 at 3–4 ¶¶ 11, 13). Koch operates as an "integrator," meaning it controls every aspect of raising chickens (also called "broilers"), slaughtering chickens, and selling the meat while relying on independent contractor farmers to grow chickens. (*Id.* at 4–5 ¶¶ 14, 19). Koch supplies its growers with chickens and supplies, establishes requirements for the growing process and facilities, and pays the growers when their chickens are deemed by Koch to be ready for slaughter after approximately 30 to 40 days. (*Id.* at 4–5, 14 ¶¶ 14, 18–19, 44). Growers own all of their own farms and equipment, provide all labor and materials necessary for growing, obtain their own financing, and bear all risk during the growing process. (*Id.* at 5, 14 ¶¶ 19, 44).

Grigsby Farm, owned and operated by Anthony Grigsby and Christy Grigsby, was a grower for Koch. (Doc. 61 at 3, 5 ¶¶ 9, 18–19). The Grigsbys are in bankruptcy and Mr. Leo represents their interests as trustee of the bankruptcy estate. (*Id.* at 3

¶¶ 9–10). Grigsby Farm started growing chickens for Koch in 2008 pursuant to a "Poultry Production Agreement." (*Id.* at 11 ¶ 33; Doc. 66-1[2]). In preparation for growing, a Koch Housing Coordinator visited the farm and informed the Grigsbys what they would need to do for Koch to rate their farm as "Class A." (*Id.* at 12 ¶ 38). Class A is one of four ratings assigned to growers—the other three being Class B, Class C, and Class D—and pertains only to new farms.  (*Id.* at 11–12 ¶¶ 37–38). Class A growers receive a higher average payment rate and a higher number of birds per square foot than Class B and Class C growers. (*Id.* at 12 ¶ 40). Grigsby Farm received its Class A rating and was "grandfathered-in" and not required to meet new Class A requirements added after the Grigsbys purchased their farm. (*Id.* at 12 ¶ 39).

Koch allegedly pits growers against each other through a competitive compensation structure. (Doc. 61 at 5–6, 15–16 ¶¶ 20, 48–50). Mr. Leo describes the compensation plan as a "tournament system" by which "all growers whose chickens are slaughtered within a given week compete with one another. The top producing growers—as solely determined by [Koch]—are paid a premium and the lower ranked growers are subjected to offsetting discounts or deductions." (*Id.* at 5–6 ¶ 20). Growers "initially are ranked, and correspondingly compensated based on

---

[2] Doc. 66-1 is a series of Poultry Production Agreement contracts between Koch and Grigsby Farm from 2008 to 2017. Koch attached the contracts as an exhibit to its motion to dismiss. The court considers the contracts without converting the motion to dismiss into a motion for summary judgment because the contracts are referenced in the third amended complaint, central to Mr. Leo's claims, and undisputed. *See Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002).

an 'Average Net Pound Value.'" (*Id.* at 15 ¶ 48). Koch allegedly "use[s] a formula to determine the performance of all growers who brought birds to slaughter that week and depending on how they perform in light of that formula in comparison to the other growers, [Koch] make[s] adjustment to their pay." (*Id.* at 15 ¶ 48). Koch's formula relies on factors like "farm weight," "farm-caused commendation," "livability," "total value," "chick value," "feed value," "feed conversion," and "net pounds" to determine whether "a grower will be paid vastly more or vastly less than the base pay denominator (Average Net Pound Value)[] per pound of broilers produced." (*Id.* at 15 ¶ 48).

Koch allegedly does not create an equal playing field for its growers in competition with each other. Koch allegedly provided the Grigsbys with "genetically different" chicks with "varying degrees of heredities, and congenital traits such as weight gain capability, susceptibility to disease and or health issues." (Doc. 61 at 16 ¶ 49). Koch also allegedly made inconsistent and delayed deliveries of poor-quality feed. (*Id.*).

Growers compete against each other even though "they possess dissimilar facilities, equipment, and technology." (Doc. 61 at 16 ¶ 50). Also, Grigsby Farm allegedly "received varying degrees of technical assistance and was required to comply with management practices which [were] inconsistent with its fellow growers." (*Id.*). Despite this, Koch allegedly "receive[s] the same sale price for its

comparable products sold no matter the type of chicken house it was grown in." (*Id.* at 16 ¶ 51).

The Poultry Production Agreements placed performance requirements on Grigsby Farm. (Doc. 61 at 17 ¶ 52). If two consecutive flocks did not have a certain "Individual Net Pound Value"—called "settling in the High 40"—then the Grigsbys would be advised that the farm's next consecutive flocks with the same problems would put the farm in "Intensified Management Status." (*Id.*). According to the Poultry Production Agreement, if Grigsby Farm was placed in Intensified Management Status, then (1) a meeting would be scheduled to discuss a performance improvement plan; (2) the farm would be removed from Intensified Management Status if it installed new equipment recommended by Koch; (3) the farm would be removed from Intensified Management Status when two of three consecutive flocks did not settle in the High 40; (4) the farm would receive 15% less chicks if it settled in the High 40 at any time while in Intensified Management Status; and (5) the farm would be subject to termination if two of three consecutive flocks settled in the High 40 and the farm ranked in the bottom 10% of all growers. (*Id.* at 17–18 ¶ 53).

The Grigsbys allegedly relied on the following assurances from Koch before entering into business with the company: Koch represented that it "would not solely act to benefit its bottom line, but would take into account *all* growers' needs and even absorb certain costs to ensure that growers could profit"; Koch's "Housing

coordinator employee" told the Grigsbys that Koch "take[s] care of [its] people";
Koch described its corporate culture of trust and aligned interests between it and its
growers; and Koch represented the amount of chickens the Grigsbys could expect
and their anticipated compensation (*Id.* at 20–21 at ¶¶ 59–62) (emphasis and
alterations in original).

Mr. Leo alleged a history of Koch's misconduct over the course of the
business relationship, including several falsehoods:

- Koch "unilaterally decreased or would excessively increase the amount of
  time [the Grigsbys were] allowed to care for the birds received, reducing
  [their] ability to achieve higher weights or better feed convers[ions], and
  thereby undermining [their] return." (Doc. 61 at 21 ¶ 64; *see also id.* at 40–
  41 ¶ 121).

- Koch decreased the Grigsbys' potential compensation for several flocks by
  extending the time between flock deliveries and instructing them to reduce
  the target weight of the birds. (*Id.* at 21 ¶¶ 64–65).

- Koch regularly provided Grigsby Farm with chickens that it "knew to be
  unhealthy or of lesser quality" and "were so sickly [Koch] ha[d]
  preemptively prescribed antibiotics" despite its policy to raise antibiotic-
  free meat. (*Id.* at 21–22 ¶ 66; *see also id.* at 36 ¶¶ 113–15).

- Koch did not deliver feed on time, let Grigsby Farm run out of feed, and charged the Grigsbys for undelivered feed. (*Id.* at 22 ¶ 67; *see also id.* at 36–39 ¶¶ 116–18).

- Grigsby Farm "incurred problems with the feed mill scale tickets that were left when feed deliveries were made"—either unused, misplaced, unstamped, incorrect, or incomplete tickets—which somehow allegedly reduced the Grigsbys' compensation. (*Id.* at 41 ¶¶ 122–23).

- Koch caught Grigsby Farm's grown chickens and let them sit in trucks without food or water, thereby reducing the chickens' weight and the Grigsbys' compensation. (*Id.* at 22 ¶ 68).

- Koch caught Grigsby Farm's grown chickens often "at an older age than the birds on other farms," resulting in delayed slaughter and smaller profits. (*Id.* at 39–40 ¶¶ 119–20).

- Koch unreasonably condemned some of Grigsby Farm's chickens, which lowered profits and the farm's ranking in the tournament system. (*Id.* at 22–23, 25–26 ¶¶ 69–70, 78–81).

- Koch allegedly manipulated the mortality rates of chickens to benefit some growers in the tournament system, disadvantage Grigsby Farm, and unequally distribute "hidden payments" to some growers. (*Id.* at 23–24 ¶¶ 71–77).

- Koch allegedly retaliated against the Grigsbys' complaints about some of Koch's allegedly fraudulent conduct by demoting Grigsby Farm to the lesser Class B pay rate and threatening unwarranted write-ups. (*Id.* at 28–29 ¶¶ 91, 98).

- Koch set requirements on Grigsby Farm's growing facilities "that were unnecessary for efficient production and do not reflect normal market forces." (*Id.* at 28 ¶ 92).

- Koch's Broiler Manager, Dion Rainwater, allegedly "told several service technicians to go together to [Grigsby Farm] without [the Grigsbys'] consent, take photos of their facilities, access the controller computers without permission and try to intimidate in hopes to find anything they could to harass the [Grigsbys] or sabotage their facilities." (*Id.* at 29 ¶ 95).

- Koch's Service Technician, Tad England, told Mr. Grigsby that a supervisor directed him to find a deficiency at the farm, that Koch wanted to end Grigsby Farm's contract, presumably around 2017, and that Koch "could do whatever it wanted to do with a grower, including delivering only eight birds in a flock, or terminating a grower's contract." (*Id.* at 29 ¶ 97).

The relationship started to become untenable for the Grigsbys in May 2017. (*See* doc. 61 at 29 ¶ 98). Around that time, Mr. England allegedly falsely claimed

that he used a static pressure test kit to measure deficient static pressure in the Grigsby Farm growing houses. (*Id.* at 29–30 ¶ 98). But Mr. Leo contends Mr. England actually measured static pressure from the computers inside each broiler house, which provided a less accurate measurement than a static pressure test kit would have provided. (*Id.* at 29–30 ¶¶ 98–99). Koch demoted Grigsby Farm to Class B because of the static pressure issue and a separate lighting issue without prior warning or opportunity to improve. (*Id.* at 29–30 ¶¶ 98, 100). The Grigsbys had only ever received written notice of their failure to dispose of dead birds two months prior. (*Id.* at 30 ¶ 100).

Mr. England, Mr. Rainwater, and Koch's Live Production Manager, Danny Satterfield, allegedly gave the Grigsbys two options to bring Grigsby Farm back up to Class A: (1) delay the farm's next shipment of chickens for two weeks until they remedied the static pressure and lighting issues and brought the growing houses into Class A compliance; or (2) receive the next flock as scheduled, grow that flock at the Class B payment rate, and then return to Class A if they corrected the deficiencies. (Doc. 61 at 30–31 ¶ 101). Mr. Grigsby chose the second option. (*Id.* at 31 ¶ 102). But no Koch representative ever told the Grigsbys that they would have to "ma[ke] all upgrades that were then currently required of Class A broiler houses" before earning Class A status again and the written agreement between Koch and

Grigsby Farm dated April 12, 2017 does not contain that requirement. (*Id.* at 31–32 ¶¶ 102–03).

Grigsby Farm received its first flock after the Class B downgrade on June 5, 2017. (Doc. 61 at 32 ¶ 104). The flock was smaller than usual with roughly 8,000 less birds than the prior five flocks. (*Id.*).

When Mr. Grigsby informed Mr. England that he corrected the static pressure and lighting issues, Mr. England responded that Grigsby Farm still needed approximately $50,000 worth of upgrades before it could return to Class A. (Doc. 61 at 32–33 ¶¶ 105–06). Mr. Grigsby tried to secure a loan from Alabama Farm Credit for the costs to upgrade. (*Id.*). Mr. Grigsby told Mr. Satterfield that Alabama Farm Credit required a letter from Koch stating that it had a Class A contract with Grigsby Farm. (*Id.*). Mr. Satterfield told Mr. Grigsby that he visited Alabama Farm Credit, told the loan officer in person that the Class A contract existed, and that no letter was actually needed. (*Id.* at 34 ¶ 107). Apparently, these statements were misleading, because the loan officer then informed the Grigsbys "that their cash flow was not sufficient to support an additional loan, and that they needed to come up with $50,000 in additional income" to obtain the loan. (*Id.*). The Grigsbys could not, so they did not obtain a loan, did not make the additional upgrades, and remained on Class B status. (*Id.* at 34 ¶ 108).

The next issues occurred in late 2018 or early 2019. (Doc. 61 at 35 ¶ 110). Around that time, Koch informed Mr. Grigsby that the Grigsbys would have to meet with Koch's live production management prior to receiving another flock. (*Id.*). Mr. Grigsby asked Mr. Rainwater about the meeting and asked why Koch "had changed [its] mind[] on allowing [Grigsby Farm] to return to Class A payment and placement after they remedied the Static Pressure and lighting deficiencies." (*Id.*). Mr. Rainwater said that "he would not answer that question unless his superiors told him that he was required to do so." (*Id.*). Mr. Grigsby requested that Mr. Rainwater put his statement in writing and for a neutral meeting location other than Koch's offices. (*Id.* at 35 ¶ 111). Both requests were refused. (*Id.*). Koch then suspended all deliveries to Grigsby Farm without notice or explanation. (*Id.* at 35–36 ¶ 112).

From these allegations, Mr. Leo brings three claims: (1) violations of the Packers and Stockyards Act of 1921, 7 U.S.C. § 181 *et seq.*; (2) breach of contract; and (3) fraud. (Doc. 61 at 46–51). Koch has moved to dismiss parts of the fraud claim pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. (Doc. 66 at 2). According to Koch, Mr. Leo brings seven individual fraud claims, six of which are not pleaded with particularity as required by Rule 9(b) and otherwise fail to state a plausible claim for relief under Rule 12(b)(6). (Doc. 67 at 6–11). Mr. Leo responds that he alleges one long fraudulent scheme involving several misrepresentations over the course of several years; he contends that he pleads every

aspect of this fraud with particularity under Rule 9(b) and with factual sufficiency under Rule 12(b)(6). (Doc. 69 at 5–8).

## II.   DISCUSSION

"To survive a [Rule 12(b)(6)] motion to dismiss, the plaintiff must plead 'a claim to relief that is plausible on its face.'" *Butler*, 685 F.3d at 1265 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plausible claim for relief requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" to support the claim. *Twombly*, 550 U.S. at 556. A complaint need not contain detailed factual allegations, but a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555.

Rule 9(b) establishes a heightened pleading standard for fraud claims. Under Rule 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Particularity means that a plaintiff must plead facts as to time, place, and substance of the . . . alleged fraud, specifically the details of the . . . allegedly fraudulent acts, when they occurred, and who engaged in them." *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1357 (11th Cir. 2006) (quotation marks omitted). In other words, to satisfy Rule 9(b),

a plaintiff must allege "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (quotation marks omitted).

At the outset, the court must put to rest the debate as to how many frauds Mr. Leo alleges. He alleges *one* count of fraud. (*See* doc. 61 at 50). According to the third amended complaint, the fraud involved several misrepresentations over the course of several years. The misrepresentations supported by "facts as to time, place, and substance of the . . . alleged fraud, specifically the details of the . . . allegedly fraudulent acts, when they occurred, and who engaged in them" will survive the Rule 9(b) challenge. *See McInteer*, 470 F.3d at 1357. The others will not. So the court will determine which fraudulent acts are pleaded with sufficient particularity under Rule 9(b)—*i.e.*, those that can support Mr. Leo's fraud claim moving forward—and which are not. If any allegations satisfy Rule 9(b), then the court will determine whether they also satisfy Rule 12(b)(6).

Also, Koch concedes that Mr. Leo's allegations about Koch downgrading Grigsby Farm from Class A to Class B in 2017 satisfy Rules 9(b) and 12(b)(6) for

the fraud claim. (Doc. 67 at 9, 13). Mr. Leo sets out those allegations in paragraphs 98 through 109 in the third amended complaint. (Doc. 61 at 29–35 ¶¶ 98–109). Those paragraphs allege all of the circumstances surrounding the static pressure and lighting issues, the Class B reclassification, the Class A criteria communicated to the Grigsbys, the Grigsbys' corrective actions, the attempt to secure a loan from Alabama Farm Credit, and the dwindling flock deliveries. (*See id.*). The fraud claim will proceed with those supporting allegations.

Mr. Leo first alleges misrepresentations that fraudulently induced the Grigsbys into entering into business with Koch. (*See* doc. 61 at 6, 8, 13, 20–21, 26–27 ¶¶ 22, 31, 42, 59–63, 83, 85).[3] In the most general sense, these allegations boil down to an accusation that Koch described to the Grigsbys a mutually beneficial and harmonious relationship but concealed the eventual unfair ranking system, manipulated compensation scheme, unreasonably condemned birds, low-quality supplies, unhealthy chickens, and more. For example, Mr. Leo alleges:

> Defendants induced Plaintiff to join its operation through material representations regarding their compensation and Koch Foods' institutional commitment to ensure that growers receive a reasonable return on their investment. But, in fact, as Defendants knew or should have known, they had no policy or procedures in place to protect

---

[3] Mr. Leo does not explicitly rely on most of these paragraphs as a basis for his fraud claim in the "Count [III]: Fraud" section of the third amended complaint. Instead, in that section, he alleges fraud "as set out above in paragraphs 31, 38, 69, 71–77, and 82–123." (Doc. 61 at 50 ¶ 169). Even so, all of the allegations touching on fraud are similar, related, and sometimes the same allegation stated a different way. So the parties have effectively briefed all factual allegations related to fraud and, in the spirit of construing complaints liberally, the court parses the entire third amended complaint for any allegations of fraud.

growers, including Plaintiff. Instead, Defendants operate their business to consistently advantage itself, to the disadvantage of the growers, regularly breaching its commitments to growers regarding the type and volume of product they will be asked to produce—undermining growers' ability to turn a profit—and manipulating its operations so that growers can neither predict nor rely upon a specific level of income.

(Doc. 61 at 6 ¶ 22). Similarly, Mr. Leo alleges that Koch assured the Grigsbys that it "would apply its system fairly and, in a manner, to ensure Plaintiff a reasonable return on their investments"; represented that it "would not solely act to benefit its bottom line, but would take into account *all* growers' needs and even absorb certain costs to ensure that growers could profit"; convinced growers that "Koch's business interests and plans aligns with those of the grower"; made false "representations regarding its corporate structure" and the "amount of chickens Plaintiff could expect to be provided and the anticipated compensation for those chickens"; concealed its "actual corporate strategy, policy, and practices" of "advanc[ing] the company's bottom line regardless of its impact on growers"; and misrepresented Grigsby Farm's financial prospects. (*Id.* at 13, 20–21, 26–27 ¶¶ 42, 59, 61–63, 83, 85). None of these allegations specify the source, content, time, or location of any misrepresentations, so they cannot support the fraud claim under Rule 9(b).

Mr. Leo alleges only one specific statement of purportedly fraudulent inducement. Prior to entering into the Poultry Production Agreement, Koch's housing coordinator allegedly assured the Grigsbys that Koch "take[s] care of [its] people." (Doc. 61 at 20 ¶ 60) (alterations in original). Mr. Leo does not particularly

allege the timing of the statement, "the manner in which [the assurance] misled the plaintiff," or "what the defendants obtained as a consequence" of it, *see Ziemba*, 256 F.3d at 1202, so the allegation does not satisfy Rule 9(b). But, even if it did, such unremarkable, isolated, and customary praise for a business's own performance would not state a plausible claim for fraud, and thus would also fail to satisfy Rule 12(b)(6).

Next, paragraph 31 alleges nine apparent falsehoods and/or failures of Koch's performance under the Poultry Production Agreement as false promises. (Doc. 61 at 8–10 ¶ 31). Mr. Leo repeats or elaborates on those allegations throughout the third amended complaint. Those allegations are:

1. Koch promised that investing in larger chicken houses would be profitable and that it would deliver 30,800 chickens per flock, but the larger houses were not profitable, the Grigsbys took on unnecessary debt because of the promises, and Koch later delivered less than 30,800 chickens per flock. (*Id.* at 8 ¶ 31a).

2. Koch "represented to Plaintiff that when developing the rankings of the growers, condemnation would not be counted against them," but, in reality, "condemnation was indeed charged against the Plaintiff, to its financial detriment." (*Id.* at 8–9 ¶ 31b; *see also id.* at 22–23, 25–26 ¶¶ 69–70, 78–81).

3. Koch "falsified tickets outlining how much feed the Grigsbys were actually given" and "charged Plaintiff for feed that was never actually delivered." (*Id.* at 9 ¶ 31c; *see also id.* at 22 ¶ 67).

4. Koch "improperly and unnecessarily delayed weighing birds which resulted in reduced compensation"—this allegation lacks a misrepresentation or concealment, but presumably Mr. Leo intends to assert that Koch fraudulently concealed its weighing practices or broke some prior promise. (*Id.* at 9 ¶ 31d; *see also id.* at 22, 27 ¶¶ 68, 87).

5. By manipulating "mortality sheets," Koch falsified the numbers of birds that died at Grigsby Farm to give other growers an advantage in the tournament system, increase Koch employees' payments, unequally distribute "hidden payments" to some growers, and reduce the Grigsbys' compensation. (*Id.* at 9 ¶ 31e; *see also id.* at 23–24, 27–28 ¶¶ 70–77, 88–90).

6. Koch promised to deliver non-refurbished feed on time, but then made many late deliveries of refurbished feed of the wrong type. (*Id.* at 9 ¶ 31f; *see also id.* at 22, 27 ¶¶ 67, 86–87).

7. Koch demanded several expensive and unreasonable upgrades for Grigsby Farm after representing that any changes in chicken house specifications

would be reasonable.[4] (*Id.* at 9–10 ¶ 31g; *see also id.* at 10, 27–28 ¶¶ 31h, 87, 91–92).

8.   Koch arbitrarily placed more burdensome chicken house specifications on Grigsby Farm than other growers after promising that "any and all chicken house specifications would be applied across the board." (*Id.* at 10 ¶ 31h).

9.   Koch promised deliveries of healthy chicks, but then delivered unhealthy chicks. (*Id.* at 10 ¶ 31i; *see also id.* at 21–22 ¶ 66).

All of these alleged misrepresentations lack a who, when, and where. Mr. Leo has not alleged who at Koch made any of those representations, to whom they were made, or when and where they were made over the course of the parties' 11-year relationship. With the exception of the allegations as to the falsified tickets and mortality sheets, the allegations also do not allege how Koch made the representations. And even the falsified tickets and mortality sheets allegations lack particular false statements. Accordingly, paragraph 31 does not plead circumstances of fraud with particularity; rather, it alleges certain breaches of contract or other wrongs that were apparently inconsistent with prior vague representations on which the Grigsbys relied. Therefore, the allegations in paragraph 31 of the third amended complaint do not satisfy Rule 9(b).

---

[4] The extent to which this category of allegations overlaps with the allegations surrounding Grigsby Farm's downgrade to Class B is not clear. The court does not intend to refer to the Class B allegations, (doc. 61 at 29–35 ¶¶ 98–109), in this section.

Mr. Leo also alleges that the Grigsbys relied on a Koch housing coordinator's initial representations of the requirements for a Class A farm by obtaining financing for the Class A infrastructure based on Class A pay. (Doc. 61 at 12 ¶ 38). Mr. Leo asserts that this allegation describes "material, false representations." (*Id.* at 50 ¶ 169) (citing *id.* at 12 ¶ 38). Mr. Leo is incorrect. He may describe a circumstance relevant to the Class B demotion many years later, but he does not allege the statement was false when made. In fact, although Mr. Leo references instances where farms were grandfathered in to their initial classification when classification requirements changed, Mr. Leo does not allege that the housing coordinator represented that Grigsby Farm's classification would never change or would be grandfathered under its initial classification requirements.

Next, Mr. Leo seemingly alleges fraud based on Koch's failure to provide notice of it suspending bird deliveries to Grigsby Farm. (Doc. 61 at 35–36 ¶¶ 110–12). Mr. Leo alleges that, in late 2018 or early 2019, Koch inexplicably required the Grigsbys to meet with Koch's live production management before receiving their next flock, that Mr. Rainwater refused to answer questions about the meeting, put his statement in writing, or hold the meeting in a neutral location, and that Koch then refused to deliver more birds to Grigsby Farm without any written notice. (*Id.*). Mr. Leo leaves the court to speculate as to what the alleged fraudulent misrepresentation or concealment may have been in this scenario. So the allegations about the

suspension of bird deliveries do not satisfy Rules 9(b) or 12(b)(6) as to the fraud claim.

Finally, Koch asserts that paragraphs 82 through 89 and 113 through 123 in the third amended complaint set out one of Mr. Leo's seven individually alleged frauds. (Doc. 67 at 6). The court previously addressed most of the allegations contained in paragraphs 82 through 89. The so-far unaddressed allegations in that range are all conclusory statements. (*See, e.g.*, doc. 61 at 26 ¶ 82) ("Defendants have engaged in a pattern of conduct that is unfair, unjustly discriminatory, unreasonably preferential or advantageous, unreasonably prejudicial, unreasonably disadvantageous, fraudulent, manipulative, deceptive, and negligent in order to impede and hinder Plaintiff's ability to efficiently and profitably care for broilers, and at the same time conceal their malicious and outrageous conduct . . . .").

Paragraphs 113 through 123 first describe the aforementioned feed and chick quality issues, but then allege new issues as to Koch's catching schedule, the number of chicks delivered, and "feed mill scale tickets." (Doc. 61 at 39–41 ¶¶ 119–23). As to the catching schedule, Mr. Leo alleges that Koch represented to the Grigsbys that they "would be treated fairly in the sale of the chickens," but then "the chickens on Grigsby Farm were often caught at an older age than the birds on other farms." (*Id.* at 39 ¶ 119). Without any supporting facts about this vague allegation of "fair[ness]," the allegation as to the catching schedule is not pled with particularity under Rule

9(b). And, as to the issues with the number of chicks delivered and the feed mill scale tickets, Mr. Leo does not allege any specific misrepresentation or concealment, so those allegations also cannot support a fraud claim under Rules 9(b) or 12(b)(6).

## III.   CONCLUSION

For the reasons stated above, the court **WILL GRANT** Koch's partial motion to dismiss (doc. 66) and dismiss Mr. Leo's fraud claim to the extent that it relies on any allegations besides those set out in paragraphs 98 through 109 in the third amended complaint. The court will enter a separate order consistent with this memorandum opinion.

**DONE** and **ORDERED** this September 13, 2022.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE